1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ANGEL GARCIA,

                    Petitioner,

   v.

WARDEN BAKER, et al.,

                   Respondents.

Case No. 3:17-cv-00291-RCJ-CLB

ORDER

Angel Garcia's amended 28 U.S.C. § 2254 petition for writ of habeas corpus is before the court for adjudication on the merits (ECF No. 14).

I.    **Background & Procedural History**

In October 2008, 17 year-old Garcia shot and killed 2 men—aged 19 and 20—during a confrontation over gang graffiti (ECF No. 14, p. 2). In December 2010, a jury convicted Garcia of 2 counts of second-degree murder (exhibits 70, 71).[1] The state district court sentenced him to 2 terms of 10 years to life, each followed by a term of 8 to 20 years for the deadly weapon enhancement, all sentences to run consecutively. Exh. 74.  The court entered the judgment of conviction on February 25, 2011. Exh. 75.

The Nevada Supreme Court Garcia's convictions in April 2012 and affirmed the denial of Garcia's state postconviction habeas corpus petition in February 2017.  Exhs. 100, 135.

---

[1] Exhibits referenced in this order are exhibits to respondents' answer, ECF No. 19, and are found at ECF Nos. 20-22, 24.

1

Garcia dispatched his federal habeas petition for mailing on or about April 13, 2017 (ECF No. 8). This court granted Garcia's motion for appointment of counsel (ECF No. 5). Garcia filed a counseled, amended petition (ECF No. 14). Respondents have answered the petition, and Garcia has replied (ECF Nos. 19, 29).

II. **Legal Standard—Antiterrorism and Effective Death Penalty Act (AEDPA)**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.  Finally, in conducting an AEDPA analysis, this court looks to the last reasoned state-court decision.  *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014).

A state prisoner is entitled to federal habeas relief only if he is being held in custody in violation of the constitution, laws or treaties of the United States.  28 U.S.C. § 2254(a). Unless an issue of federal constitutional or statutory law is implicated by the facts presented, the claim is not cognizable under federal habeas corpus.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A petitioner may not transform a state-law issue into a federal one merely by asserting a violation of due process.  *Langford v. Day*, 110 F.3d 1380, 1381 (9th Cir. 1996).  Alleged errors in the interpretation or application of state law do not warrant habeas relief.  *Hubbart v. Knapp*, 379 F.3d 773, 779-80 (9th Cir. 2004).

### III.   **Trial Testimony**

At trial, several friends and acquaintances of Garcia testified that at a party at an apartment on the night in question Garcia showed them a small, semi-automatic handgun that he kept in his front pants pocket.  *See* exh. 63, pp. 11-149.  One friend testified that Garcia was drinking and was stumbling around. Exh. 63, p. 9-10.   Garcia was a member of the gang South Side Locos (SSL).  People were inside and outside the apartment, partying, drinking, and using drugs, when a partygoer alerted everyone that two young men who were with the Neil Road Clique (NRC) gang were painting over some South Side Locos graffiti on a nearby wall.  Expert testimony reflected that another gang painting over or "crossing out" another gang's graffiti is considered a serious act of disrespect. At least 20 partygoers headed over to the wall and confronted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the two, unarmed NRC members.  Garcia's friends and acquaintances testified that they all expected that the NRC members would be beaten up.

When Garcia went toward the two NRC members, his friend Cesar Navas grabbed Garcia to try to stop or restrain him and told him to relax. *See* exh. 63, pp. 49, 99, 108. Garcia said something like "let me go or I'll shoot your ass too".  *See also* exh. 64, pp. 112-113.  Garcia then shot the NRC members, hitting each man twice at close range.  Witnesses testified that after he shot them Garcia said "Nobody disrespects me in my hood" or something similar.  *Id.* at 144.  One victim was pronounced dead at the scene; the other died at a hospital later that day.

A friend of Garcia's testified that generally everyone expected that there would be a fist fight but that she was surprised that Garcia shot the men because he was usually "smart" and "not real hot-headed" Exh. 63, p. 118.

Dr. James Hernandez, a criminal justice professor, testified for the defense.  Exh. 66, pp. 8-39. He was formerly director of police community relations for the City of Pittsburgh Police Department. He explained that he primarily studied street gangs and threat groups. Dr. Hernandez testified that his studies consistently have found that kids join gangs to duplicate a feeling of family. He stated that there is heavy peer pressure, that the gang's reputation is paramount, and that anybody who does not live up to expectations can be punished, sometimes brutally, or expelled from the gang. When one gang "crosses out" the graffiti of another it is viewed as a challenge, a threat. It is "erasing" the person or essentially a message to the person who painted the graffiti that he or she does not exist.  Hernandez discussed generally that gang membership is characterized by strongly impulsive behavior.  Resisting peer pressure within the gang structure is very difficult because that member is turning his or her back on everybody and everything.

Forensic psychiatrist Dr. Jay Jackman testified. Exh. 66, pp. 72-128. Dr. Jackman explained that he interviewed Garcia over 2 sessions for a total of 6 hours. Dr.

5

Jackman also interviewed members of Garcia's family, who detailed his extremely troubling family history, including moving nearly 20 times, periods of homelessness, never knowing his father, physical and sexual abuse, his mother's and other family members' extensive drug use, and his mother's longtime gang membership. He also noted that 3 or 4 grand jury witnesses described Garcia as drunk when the shooting occurred.  Dr. Jackman opined that when Garcia killed the men, he acted with impulsive behavior known as reactive aggression in response to the serious gang offense of being crossed out.

IV.   **Instant Petition**

**Ground 1**

Garcia asserts that jury instruction no. 21 relieved the State of its burden to prove the offense beyond a reasonable doubt, in violation of his Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial (ECF No. 14, pp. 7-9).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502 U.S. at 72.

Jury instruction no. 21 stated:

> Malice aforethought, as used in the definition of murder, means the intentional doing of a wrongful act without legal cause or excuse, or what the law considers adequate provocation. The condition of mind described as malice aforethought may arise, not alone from anger, hatred, revenge or from particular ill will, spite or grudge toward the person killed, but may also result from any unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief, or with reckless disregard of consequences and social duty.

> Malice aforethought may be inferred from the intentional use of a deadly weapon in a deadly and dangerous manner.
>
> "Aforethought" does not imply deliberation or the lapse of considerable time. It only means the required mental state must precede rather than follow the act.
>
> Exh. 69, p. 23.

Defense counsel John Ohlson objected to this instruction at trial. Exh. 66, p. 130. Ohlson conceded that the instruction was based on existing law but argued that it is an impermissible inference against the accused in a criminal matter.  Ohlson objected again just before the court instructed the jury, arguing that the instruction raised an unlawful presumption against the accused. Exh. 68, pp. 12-13.

Garcia argues in his federal petition that the instruction improperly directed the jury to find implied malice if it found a firearm was used, thus relieving the State of its burden of proof on the element of malice. It was undisputed at trial that Garcia had used a firearm; he asserts that the effect of the instruction was to direct the jury to presume malice because under the instruction the use of a firearm necessarily meant that Garcia was guilty of second-degree murder (ECF No. 14, pp. 8-9). Garcia claims that he put on evidence supporting a voluntary manslaughter verdict and that it is not clear beyond a reasonable doubt that the jury would have found Garcia guilty of second-degree murder absent the erroneous instruction.

Rejecting this claim on direct appeal, the Nevada Supreme Court explained:

> Garcia contends that the implied malice instruction created an unconstitutional presumption that improperly shifted the burden of proof. We conclude that the district court's malice instruction was proper.  The instruction provided, "Malice aforethought may be inferred from the intentional use of a deadly weapon in a deadly and dangerous manner." This court has held that use of the word "may" in a malice instruction "'eliminates the issue of a mandatory presumption.'" *Leonard v. State*, 17 P.3d 397, 413 (Nev. 2001) (quoting *Cordova v. State*, 6 P.3d 481, 483 (Nev. 2000)). The jury also was properly instructed on the presumption of innocence and the State's burden to prove every element of the crime beyond a reasonable doubt. There was no improper shifting of the burden of proof.

7

Exh. 100, pp. 3-4.

Garcia has not shown how the use of the word "may" creates a mandatory presumption.  The court further is not persuaded that the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle*, 502 U.S. at 72 (citation omitted). Garcia has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Ground 1, therefore, is denied.

**Ground 2**

Garcia contends that his sentence is the "functional equivalent" to a life sentence, which constitutes cruel and unusual punishment in violation of his Fifth, Eighth, and Fourteenth Amendment rights (ECF No. 14, pp. 9-14).

Pursuant to the version of NRS 200.030(5) at the relevant time, the two potential punishments for second-degree murder were life with the possibility of parole after 10 years or a term of 10 to 25 years. In Garcia's reply in support of the petition, he argues that because he is not eligible for parole until he serves a minimum of 36 years, his sentence is functionally equivalent to a life sentence, which—because he committed the crimes when he was a juvenile—violates his Eighth Amendment right to be free from cruel and unusual punishment (ECF No. 29, pp. 9-24).

The Nevada Supreme Court rejected this claim, explaining:

Appellant Angel Joel Garcia argues that his aggregate sentence, which requires him to serve a minimum of 36 years before he is eligible for parole for two counts of murder committed when he was a juvenile, violates the Eighth Amendment [FN1]. Based upon our review of the record, we conclude that the district court did not err in denying relief.

Garcia first argues that his sentence is the functional equivalent to life without the possibility of parole, in violation of this court's holding in *Boston*, because the aggregate sentence is so long as to deny him a

8

meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. However, Garcia provides no cogent argument or legal authority to support his assertion that an aggregate sentence providing for minimum parole eligibility after 36 years is the functional equivalent of a life sentence without the possibility of parole [FN2]. Thus, we conclude that Garcia has failed to demonstrate error. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (providing it is the appellant's burden to present relevant authority and cogent argument on appeal).

Garcia further argues that his aggregate sentence violates *Miller* because the district court did not consider factors related to a juvenile offender's immaturity, impetuosity, family and home environment, and diminished culpability when sentencing him. We disagree. The factors relating to a juvenile offender's transient maturity were presented to the district court at sentencing in a report submitted by the defense. Although the district court only briefly alluded to the report at sentencing, the district court indicated that it had considered the factors and agreed with the information regarding juvenile offenders and their transient maturity. Nothing in *Miller* requires the district court to outline its reasons for imposing a particular sentence.

1. It appears that the district court determined that Garcia demonstrated good cause for his failure to raise this claim on direct appeal based on the decisions in *Miller v. Alabama*, 132 S.Ct. 2455 (2012), and *State v. Boston*, 131 Nev. Adv. Op. 98, 363 P.3d 453 (2015), which were entered after his direct appeal.

2. Notably, Garcia is ineligible for the accelerated parole consideration provided by NRS 213.12135(1)(b) (providing for parole eligibility after serving 20 years for a juvenile offender convicted of murder) because his crimes involve the death of two victims.

Exh. 135, pp. 1-2.

Garcia now argues that the Nevada Supreme Court's decision was unreasonable in light of the line of U.S. Supreme Court decisions regarding juvenile jurisprudence that includes *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016); *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48, (2010); *Roper v. Simmons*, 543 U.S. 551 (2005).  The Court in *Roper* held that the imposition of the death penalty for juveniles constituted cruel and unusual punishment in violation of the Eighth Amendment. 543 U.S. at 569. In *Graham*, the Court held that a sentence of life without parole for a juvenile for a nonhomicide offense also violated the Eighth Amendment.  560 U.S. at 82.

9

Subsequently, the Court concluded in *Miller* that mandatory life without parole sentences for those under age 18 at the time of their crimes violated the Eighth Amendment. 567 U.S. at 465 (the Court concluded in *Montgomery v. Louisiana*, 136 S. Ct. at 732-734 that *Miller v. Alabama* announced a substantive rule of constitutional law that is retroactive).

The Court in *Miller* and *Graham* discussed the constitutional requirement of individualized sentencing for defendants facing the most serious penalties. In *Miller*, the Court held that the confluence of two lines of precedent led it to conclude that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment. 567 U.S. at 470. The Court noted the evolution of a foundational principle that "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474. The Court held that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances considering the principles and purposes of juvenile sentencing. *Id.* at 479. The *Miller* court stressed:

> [G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."

*Id.* at 479-480 (quoting *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68). The Court said that it did not foreclose a sentence of life without parole for a particular juvenile, but that the sentencer is required to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

In this case, just prior to the sentencing hearing, the defense submitted a new psychological evaluation of Garcia. Exh. 73. In her report, clinical psychologist Dr.

Martha Mahaffey outlined how generally several mitigating factors warrant consideration when sentencing juveniles, including penal proportionality and adolescent development, deficiencies in decision-making capacity due to immaturity, heightened vulnerability to coercive circumstances, unformed character, cognitive maturity, and psychosocial maturity. The report then discussed those factors as they applied to Garcia. The report stated that in most of those categories, Garcia was evaluated to be even less developed than the average juvenile of his chronological age.

Dr. Mahaffey's evaluation included interviews with Garcia. He reported to her that he had been angry about a close friend who had been shot by a gang rival, and he feared generally for his safety. *Id.* at 12-13. According to Garcia, at the party his peers called upon him to act, and he perceived that another close friend's life was in danger. When his friend restrained him, it triggered/escalated his anger and feelings of helplessness. He heard a van revving its engine, saw a gang rival fidgeting with his pocket and thought that he was at imminent risk of being shot.  He was of the gang mentality "shoot or be shot."

At Garcia's sentencing, the prosecutor addressed the psych report, arguing that it did not comport with the evidence adduced at trial.  Exh. 74, pp. 9-18. He stressed that the testimony reflected that 17 year-old Garcia approached the two, unarmed men, aged 19 and 20, with a loaded .25 caliber pistol, Garcia's friend attempted to restrain him, Garcia freed himself and then shot both men from about 12 to 18 inches away. The prosecutor acknowledged mitigating circumstances in Garcia's background, but argued that on these facts the maximum sentences were warranted.

Garcia addressed the court. *Id.* at 19-22.  He expressed remorse for all the pain and grief his actions caused. He admitted he had made ignorant and foolish choices and looked for "love and comfort" in the wrong places.  He commented on his troubled family:

> I lost all respect for my mom because of the way she acted on drugs and the things that I saw her do.  It killed me inside that she loved the drug more than me. . . . I never had a dad growing up. And when my real dad

tried coming into my life, I hated him.  He was just a stranger to me. I
never listened to him either.

*Id.* at 20.

The sentencing judge explained his rationale, noting at the outset that Garcia was 16

years-old at the time[2] and stating that Garcia shot two young, unarmed men for, in the

court's view, no reason. He acknowledged the psychological report:

recognizing what Dr. Mahaffey said about your age and your brain
development -- and I can agree with that. I have done a lot of outside
reading concerning that. And there is evidence to indicate that she is
accurate. But I also agree with [the prosecutor]; that a lot of things that you
told her were not accurate based upon the trial . . . . Again, it is such a
waste. Such a waste. . . . You are going go to go out to Ely prison. . . .
You'll be released when you are in your 50's. That's sad.

*Id.* at 35-36.

The judge also explained the weapon enhancement, stating that he was convinced

that the maximum was required because Garcia had pulled the gun out earlier in the

evening before the shootings, and his friend tried to stop him from using the gun.

Garcia now argues that because his extensive prison sentences are essentially a

life sentence, *Miller* required his sentencing judge to specifically consider his age and

attendant relevant background (family situation, etc.) (ECF No. 29, pp. 9-19).  Garcia

points to a Seventh Circuit Court of Appeals decision that applied *Miller* in a case where

the petitioner was sentenced to a term of years. *McKinley v. Butler*, 809 F.3d 908, 911

(7th Cir. 2016). In *McKinley* the petitioner was convicted of first-degree murder

committed at age 16 and was sentenced to 2 consecutive terms of 50 years. *Id.* at 909.

That court concluded that *Miller* extends to such a *de facto* life sentence and that the

sentencer was required to "take into account how children are different, and how those

differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at

910, quoting *Miller*, 567 U.S. at 480. The court of appeals in *McKinley* vacated and

remanded, holding that the sentencing judge "had said nothing to indicate that he

---

[2] As discussed, Garcia actually was 17 years-old at the time of the shootings.

considered the defendant's youth to have the slightest relevance to deciding how long to make the sentence." 809 F.3d at 910.

While *Graham* and *Miller* show how federal constitutional law continues to evolve in relation to juvenile offenders, they do not dictate that Garcia is entitled to habeas relief here.  Garcia points to no federal constitutional law that has been clearly established by the U.S. Supreme Court that the state district court's imposition of an aggregate term of 36 years to life is a *de facto* life sentence for a juvenile offender and in violation of Garcia's federal constitutional rights.  He further contends that the judge failed to consider his "special circumstances" as a juvenile in contravention of *Miller* and the Eighth Amendment. First, of course it is entirely unclear that the sentencing court, which did not impose an actual sentence of life in prison without the possibility of parole, was required to make any specific findings under *Miller*.  Second, the sentencing judge had presided over the trial at which defense had presented at trial 3 experts who testified regarding Garcia's very troubled family background and the strong and dangerous pressure of gang membership. The transcript for Garcia's sentencing hearing reflects extensive references to the psychological report.  The court referred to the report and acknowledged that Garcia's age and brain/maturity development were mitigating factors. The court also explained its view that even considering the mitigating factors, the specific facts of the 2 shootings warranted the maximum sentences.  This is a severe sentence, but Garcia has not shown that it runs afoul of current federal constitutional law.

Thus, the court concludes that Garcia has failed to demonstrate that the Nevada Supreme Court's decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d); *see, also, e.g., Carey v. Musladin*, 549 U.S. 70, 77 (2006) (holding that, where Supreme Court

case law does not give a clear answer to the question presented, state court's decision on the issue must be given deference under § 2254(d)(1)).  Federal habeas relief is denied as to ground 2.

The petition, therefore, is denied in its entirety.

V.      **Certificate of Appealability**

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

Having reviewed its determinations and rulings in adjudicating Garcia's petition, the court finds that reasonable jurists would not find its determination of any grounds to be debatable pursuant to S*lack*.  The court therefore declines to issue a certificate of appealability.

VI.     **Conclusion**

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 14) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: 22 September 2020.

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE